# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00725-COA

TIMOTHY WARREN WILSON A/K/A                 **APPELLANT**
TIMOTHY WILSON

v.

STATE OF MISSISSIPPI                                       **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/17/2024 |
| TRIAL JUDGE: | HON. DEWEY KEY ARTHUR |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | CYNTHIA ANN STEWART |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JULIANNE KAY BAILEY |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/28/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., LAWRENCE AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1. After a jury trial in the Circuit Court of Rankin County, Mississippi, Timothy Wilson was found guilty of felonious child abuse pursuant to Mississippi Code Annotated section 97-5-39(2) (Rev. 2020) and was sentenced to a term of thirty years, with twenty years to serve and the remaining ten years suspended, in the custody of the Mississippi Department of Corrections. Wilson appealed. Finding no error, we affirm his conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶2. On December 19, 2022, Wilson, his wife Cara and their two-month-old daughter,

A.W.[1] met Cara's mother and younger siblings for breakfast to celebrate a family birthday. After the birthday breakfast, three of Cara's young siblings went back to Wilson and Cara's apartment, where they remained until around 4:00 p.m. that evening. Cara left the apartment around 1:45 p.m. to go to work. At the time Cara left the apartment, A.W. had fallen asleep on the full-size bed in her room. According to Cara, she asked Wilson to check on A.W. periodically throughout the evening while she was at work. Wilson and the siblings were in the living room playing video games for the majority of the evening.

¶3.     Wilson testified that around 3:00 p.m., he made A.W. a bottle, and one of the siblings fed her on the couch in the living room. While A.W. was taking her bottle, Wilson began making taco soup for himself and the siblings. Wilson stated that after he burped A.W., he placed her back on the full-size bed where Cara had left her sleeping. According to Wilson, after he put A.W. back to bed, the siblings ate their soup and got ready to leave the apartment. Before the siblings left, each child went into the bedroom where A.W. was sleeping to say goodbye to her. Wilson claimed that after the third sibling left A.W.'s room, A.W. began to cry. Wilson picked the baby up, calmed her down, and placed her back on the bed. Wilson stated that he began watching a television show in the living room and fell asleep. Wilson said he was awaken by A.W. crying around 6:30 p.m. He said that he lay down on the bed with her, and she went back to sleep. When he found himself dozing off as well, he moved back to the living room. Wilson stated that around 7:30 p.m., he went

_____

[1] We use initials to protect the privacy of the minor child.

back to A.W.'s room to check on her. It was dark, but he could see that she was not moving. Wilson testified that he assumed she was asleep and shut the door. Wilson did not check on her again until around 8:00 p.m., when it was time for her next bottle. He prepared the bottle, and when he picked up A.W. from the bed, he stated that her body was limp with the exception of her right arm, which was "stiff as a board." According to Wilson, A.W. never stopped breathing, but there was a hesitation in her breathing and she was non-responsive. Wilson told the jury that he changed her diaper and tried to "jostle her awake." After getting no response, Wilson tried to wake A.W. by taking her outside into cold air and rubbing cold water on her chest. Wilson stated that when he started two-finger compressions, she finally showed a slight response. Wilson then called Cara to tell her what was going on. According to Wilson, Cara told him to immediately call 911. Wilson called 911 and shortly thereafter, firemen and EMT personnel arrived on the scene.

¶4. A.W. was then transported by ambulance to University of Mississippi Medical Center (UMMC), where she arrived with hypothermia, altered mental status, and respiratory failure. A.W. had to be intubated and underwent a multitude of other tests, including an EEG, a CT scan, and an MRI. During an attempt by the attending physician to gain A.W.'s medical history from Cara and Wilson, a family history of seizures was noted. This information was passed on to the neurosurgeon and neurologist who found no seizure activity. Following the determination that A.W. had likely sustained trauma, the initial treating physician consulted Dr. Scott Benton, UMMC's Professor of Pediatrics, Chief of the Division of Forensic

3

Medicine, and Medical Director of the Mississippi Children's Safe Center. Dr. Benton then assumed care of A.W. during her hospital stay. A.W. was ultimately diagnosed with a subdural hemorrhage, a subarachnoid hematoma, and retinal hemorrhaging caused by non-accidental trauma, commonly referred to as "shaken baby syndrome."

¶5. Following standard procedure, on December 20, Flowood Police Department (FPD) Investigator Caleb Reid met with Wilson to interview him concerning the medical call the previous day. After obtaining Wilson's statement, Reid went to UMMC to speak with Cara. While there, Reid learned that A.W. had blood between her brain and skull, and the hospital believed it was most likely due to an injury or blood abnormality. Based upon this information, Reid contacted Child Protection Services (CPS). CPS conducted a walk-through of the Wilson residence on December 26 and submitted a report to FPD. The following day, CPS sent A.W.'s forensic medical report (FMR) completed by Dr. Benton, to FPD. At this point, FPD began a child-abuse investigation.

¶6. Wilson and Cara went to FPD to give formal statements on December 28. During Wilson's verbal recount of the events leading to A.W.'s medical emergency, FPD noted that Wilson's story differed from his original statement. FPD then had Wilson write a statement, in which, his story changed again. Because of his contradictory statements, Wilson was brought to FPD for a recorded interview on December 29. Before the interview, Wilson was read his *Miranda*[2] rights. During this lengthy interview, Wilson ultimately admitted to

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

holding A.W. by her shoulders and stated that he "was frustrated and just shook her." When questioned, "[F]or how long?" Wilson responded, "I would say for no longer than, at most, fifteen seconds." Following his confession, Wilson was placed under arrest and a no-contact order was entered. Wilson was later indicted by a Rankin County grand jury for felonious child abuse.

¶7. Wilson's case went to trial on March 18, 2024, and after five days of trial, the jury found Wilson guilty of felonious child abuse. The court sentenced Wilson as stated above. After the denial of his post-trial motion for judgment notwithstanding the verdict or a new trial, Wilson appealed. We address the issues raised by Wilson on appeal below.

**ANALYSIS**

I. **Did the trial court err in limiting Cara's cross-examination in violation of Wilson's rights to a fair trial, due process, effective assistance of counsel, and particularly his right to confront the witnesses against him as guaranteed by the Mississippi and United States Constitutions?**

¶8. In his brief, Wilson describes Cara's direct examination and cross-examination at trial in detail. However, outside of one sentence at the end of his argument, Wilson fails to state how Cara's cross-examination was limited. Wilson's one claim of error is that "the Judge precluded introduction of Cara's recorded statement even though it was part of the medical records." Notably, Wilson's counsel never sought to have Cara's recorded statement introduced during cross-examination, and we find no ruling by the court that "precluded" the

5

introduction of the recorded statement.[3] Wilson cites no authority to support his claim of error under this issue. Further, he fails to make any meaningful argument concerning any error he contends the trial court made.

¶9.     In *Conner v. State*, 392 So. 3d 452, 455-56 (¶16) (Miss. Ct. App. 2024), this Court stated:

> Mississippi Rule of Appellate Procedure 28(a)(7) states: "The argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on." *Walker v. State*, 197 So. 3d 914, 919 (¶25) (Miss. Ct. App. 2016). This rule "does not simply require a party to mention authority; the authority must be used to develop the argument in a meaningful way." *Id.* (quoting *Archer v. State*, 118 So. 3d 612, 621 (¶29) (Miss. Ct. App. 2012)). The Mississippi Supreme Court has held that "in the absence of meaningful argument and citation of authority, [we] generally will not consider the assignment of error." *Patton v. State*, 109 So. 3d 66, 75 (¶22) (Miss. 2012) (citing *Randolph v. State*, 852 So. 2d 547, 558 (Miss. 2002)).

We find this issue is procedurally barred.

> **II.     Did the trial court err in precluding testimony that addressed Cara's credibility and motive to lie in violation of Wilson's rights to a fair trial, due process, and particularly his right to confront the witnesses against him as guaranteed by the Mississippi and United States Constitutions?**

¶10.    Wilson claims that the circuit court erred in excluding testimony regarding an alleged romantic relationship between Cara and a man named River McGuffie.   Wilson argues that this relationship, which developed between the date of the incident and the trial, created a

---

[3] In fact, Cara's recorded statement was introduced into evidence during Dr. Benton's testimony at trial, and was published to the jury.

clear motive for Cara "to go from having no concerns about her husband to being the first witness called" at trial.

¶11.     During cross-examination of Cara at trial, Wilson's counsel sought to ask her to identify the owner of a particular phone number. The State objected and a hearing was conducted outside the presence of the jury.  Defense counsel argued that Cara had logged over 15,000 minutes of conversation with a young man.  At that point, the trial court gave counsel an opportunity to make a proffer of the testimony she wished to admit before the jury.  During the proffer, Cara identified McGuffie as the owner of the number.  She further described McGuffie as being a friend from school.  Cara testified that they had FaceTime conversations and that McGuffie visited her twice.  Cara admitted that she intended to continue her friendship with McGuffie.

¶12.     Having made the proffer, Wilson's counsel argued that Cara had made derogatory statements concerning Wilson during her direct examination.  Counsel pointed out that in her recorded interview at the time of the incident, Cara stated that she had no concerns about Wilson and that their relationship was good.   But now, defense counsel argued, this relationship with McGuffie gave Cara a motive to make derogatory comments about Wilson. At no point during the proffer or during argument did defense counsel point to any derogatory statement Cara made during her direct testimony.  The State countered that Cara's friendship with McGuffie was irrelevant and that it did not start back up until after there was a no-contact order between her and Wilson.  The State argued that Cara did everything she

could to take up for Wilson until she found out Wilson caused A.W.'s injuries.

¶13. After considering the proffered testimony, the trial court sustained the State's objection and excluded cross-examination on this issue. The court stated:

> This Court is going to sustain the objection. . . . The Court assumes that she's involved in a romantic relationship with the gentleman. The evidence before this Court is that it didn't start until August. There's certainly no evidence that it happened at the time of December 19th, which is where we are. This Court hasn't heard her say anything derogatory towards the Defendant. . . . [T]he most derogatory thing this Court heard said by this witness is that he would get frustrated when the baby cried. I don't think that's even uncommon. So for those reasons, the Court finds that it doesn't make any material issue of fact more likely or less likely and that the danger of unfair prejudice outweighs the minimal, very minimal probative value. For that reason, the Court would sustain that objection.

¶14. The trial court determined that any cross-examination regarding Cara's relationship with McGuffie was both irrelevant and more prejudicial than probative. "Limitations on cross-examination are reviewed for abuse of discretion." *Anthony v. State*, 108 So. 3d 394, 397 (¶5) (Miss. 2013) (quoting *Jefferson v. State*, 818 So. 2d 1099, 1109 (¶24) (Miss. 2002)); *Kirby v. State*, 379 So. 3d 915, 924 (¶19) (Miss. Ct. App. 2024). In *Mohamed v. State*, 323 So. 3d 532, 546 (¶39) (Miss. Ct. App. 2021), this Court stated:

> We recognize that "the right to cross-examination is secured by the confrontation clause of the Sixth Amendment to the Constitution of the United States, made enforceable against the states by the Fourteenth Amendment." *Farmer v. State*, 301 So. 3d 731, 734 [(¶12)] (Miss. Ct. App. 2020). "While defense counsel has wide latitude in cross-examination, 'the trial court in its discretion has the inherent power to limit cross-examination to relevant matters.'" *Id.* (quoting *Mixon v. State*, 794 So. 2d 1007, 1013 (¶20) (Miss. 2001)); *see also Mitchell v. State*, 792 So. 2d 192, 217 (¶97) (Miss. 2001) ("M.R.E. 611(b) allows wide-open cross-examination so long as the matter probed is relevant."). We review a circuit court's limitation of

8

cross-examination due to relevancy for an abuse of discretion. *Id*. (citing *Zoerner v. State*, 725 So. 2d 811, 813 (¶7) (Miss. 1998)).

We find no abuse of discretion by the circuit court.

> **III.** **Did the trial court err in failing to grant a mistrial after the State flagrantly defied explicit instructions not to introduce youth court rulings?**

¶15. Wilson claims that the circuit court erred in denying his motion for a mistrial after a video containing an alleged prejudicial statement was introduced into evidence and played for the jury. The jury listened to an edited version of Wilson's videotaped interview with investigator Tyler Burnell. Near the end of the recorded interview, another investigator entered the interrogation room and showed Wilson a piece of paper stating that it was Wilson's copy of a no-contact order and told him he could not have any contact with A.W. going forward. Because of the mention of the no-contact order, Wilson's counsel then moved for a mistrial arguing that youth court orders were not supposed to be mentioned at trial.

¶16. In *Amos v. State*, 363 So. 3d 601, 609 (¶37) (Miss. 2017), the supreme court stated, "Whether to grant a motion for mistrial is within the sound discretion of the trial court. The standard of review for denial of a motion for mistrial is abuse of discretion."

¶17. Prior to trial, the circuit court warned both the State and the defense that "the opinion of Judge Broome [was] not coming into evidence. Period."[4] However, the court's admonition

---

[4] At the time, Judge Broome was serving as a Rankin County Youth Court judge.

regarding admitting evidence from the youth court order was not made as a result of the anticipated use of testimony concerning a no-contact order. The circuit court's ruling came in response to Wilson's request to bring in evidence from the youth court transcripts that showed that A.W. was released back into his and Cara's custody after the incident.

¶18. Outside the presence of the jury, the day before the video was introduced into evidence, the attorneys and the circuit court judge spoke at length about redactions that needed to be made to the roughly six-and-a-half hour long video before it could be introduced into evidence. More specifically, portions of the video contained questions and instructions regarding a polygraph test and the actual administration of a polygraph test. In *Amos*, the supreme court stated: "This Court has held that 'any evidence pertaining to a witness's offer to take a polygraph test, refusal to take a polygraph test, the fact that a witness took a polygraph test[,] or the results of a polygraph test is inadmissible at trial by the State or by the defense.'" *Id*. at (¶38). Recognizing the law set forth in *Amos*, the attorneys conferred with the judge at length regarding the redaction of inadmissible parts from the video.

¶19. During that conference, the following exchange took place between Wilson's counsel and the court:

| THE COURT: | Have we watched the six-and-a-half hour video or do I have to watch the six-and-a-half hour video? |
| MS. STEWART: | I have watched it -- |
| THE COURT: | All right. |

| | |
|---|---|
| MS. STEWART: | -- but I can't tell you exactly what happened at every second. But I do know, because it was critical to our whole defense, because this case boils down to – you heard the testimony. Seven days. It boils down to this. The polygraph, I agree, it should not come in. No mention of it should come in. ***As far as I'm concerned, everything else can come in***, and it's critical that it shows they took him out of that room. |

(Emphasis added). Notably, in their conference, Wilson's attorney not only represented to the court that she had watched the whole video, she indicated that while she agreed that the polygraph should not come in, she had no objection to the rest of the video being introduced. Also, Wilson's attorney made no requests at that time to redact any portions of the video referring to a no-contact order. The agreed-upon redactions were made to the video overnight by the State in preparation for the next day of trial.

¶20. When Burnell was on the stand during direct examination the next day, the State sought to introduce the redacted interview into evidence. The following exchange took place:

| | |
|---|---|
| MR. SMITH: | Your Honor, we would move this in as State's next exhibit at this time. |
| THE COURT: | Any objection? |
| MS. STEWART: | No, Your Honor. |
| THE COURT: | Will be admitted as S7. |

Hearing no objection from Wilson's attorney, the video was then played for the jury.

¶21. During the final portion of the recording, Wilson's counsel made a motion for mistrial.

11

Wilson's attorney stated: "Judge, I'd move for a mistrial at this point. You made it very clear nothing from the youth court -- no ruling from the youth court . . . . It can't be unsaid. It can't be fixed. That's a ruling from the youth court." The State argued "[the investigator] told the Defendant that the police department is going to seek a no-contact order. There's nothing in there about the youth court making any ruling." In its ruling on the motion for a mistrial, the court stated: "the Court [is] going to overrule the motion for mistrial on the basis there's a difference between the opinion of the youth court and the issuance of a no-contact order. The Court would also note this went into evidence without objection. So the motion is overruled." The court allowed Wilson's attorney to proffer testimony regarding the no-contact order. Following the proffer, the circuit court reaffirmed its ruling denying the motion for mistrial.

¶22.    In *Willis v. State*, 348 So. 3d 1035, 1041 (¶17) (Miss. Ct. App. 2022), this Court explained the requirement of a timely objection in a similar situation:

> In this case, Willis did not object to the admissibility of the taped witness interview until after it was entered into evidence. He initially informed the court that he had no objection, and the tape was entered into evidence. It is unclear from the record how much of the tape was played to the jury before Willis objected, but the record is clear that Willis had no objection until he heard the contents of the tape. Accordingly, we find that because Willis failed to timely object to the admission of the tape, he is barred from raising the issue of its admissibility on appeal.

In the case at bar, not only did Wilson's attorney fail to timely object to the video being introduced into evidence, as noted above, defense counsel stated in a bench conference that "[t]he polygraph, I agree, it should not come in. No mention of it should come in. *As far as*

12

*I'm concerned, everything else can come in* . . . ." (Emphasis added). In *Washington v. State*, 355 So. 3d 798, 809 (¶40) (Miss. Ct. App. 2023), this Court stated:

> This Court has recently reiterated that "under the invited-error doctrine, 'a defendant cannot complain on appeal of alleged errors invited or induced by himself.'" *Jennings v. State*, 311 So. 3d 712, 718 (¶17) (Miss. Ct. App. 2021) (quoting *Thomas v. State*, 249 So. 3d 331, 347 (¶55) (Miss. 2018)). The doctrine's purpose is to (1) "bind trial counsel to strategic decisions inducing judicial rulings with the purpose of obtaining favorable judgments for their client"; and (2) "defeat the disreputable strategy aimed at requesting a judge act in a particular way to salt the record with error as an end in itself, thereby providing potential grounds for reversal of an adverse judgment." *Thomas*, 249 So. 3d at 347 (¶56).

We find that the trial court did not abuse its discretion by denying Wilson's motion for a mistrial.

> **IV.    Did the trial court err in precluding evidence about false confessions in general in violation of Wilson's right to a fair trial, due process, and effective assistance of counsel as guaranteed by the Mississippi and United States Constitutions?**

¶23.    The State filed a pretrial "Motion in Limine to Exclude Testimony of Dr. Mark Webb." In the motion, the State referred to Dr. Webb's report and noted that he intended to give an expert opinion on "coercion or false statement confession evidence." The State argued that such testimony "cannot pass any prong of the *Daubert* analysis and invades the province of the jury by going to the credibility of witnesses."[5] The State further argued in its motion that "the theory of false confessions cannot be empirically tested." Wilson filed a response to the motion and stated that the defense "does not intend to delve in the arena of

---

[5] *Daubert v. Merrell Dow Pharmaceutical Inc.*, 509 U.S. 579 (1993).

13

false confessions, which seems to be the point of the stated motion." The defense response went on to argue that "Dr. Webb is entitled to testify to the nature of the defendant and to facts and conclusions he reached in his analysis of the defendant."

¶24. During a pretrial conference the court took up the State's motion in limine. The defense called no witness and offered no evidence to show that Dr. Webb's intended testimony concerning false confessions would be admissible under *Daubert* or Rule 702 of the Mississippi Rules of Evidence. Instead Wilson's counsel argued:

> I believe that Dr. Webb is entitled to testify as to this client's nature and characteristics. ***I do not intend to put him on to testify about the nature of false confessions*. . . .**
>
> I intend to put [Dr. Webb] on to testify about his psychological examination and the nature of this client, and the jury can reach what conclusion it wants from that.

(Emphasis added). The trial judge asked counsel for any cases that supported the admission of such testimony, but none were given. After hearing argument from counsel, the court ruled:

> The Court's going to grant the motion in limine as to Dr. Webb. In particular what the Court is looking at is the long line of cases in this state and other states condemning so called false confession experts. Also the court would point out under *Smith v. State* and another long line of case law, CAC experts are prohibited from giving this exact type of testimony.
>
> Further, the Court would note that when it comes to a false confession, under *Allen v. State*, a ***Defendant is most certainly entitled to take the witness stand, or other witnesses, and talk about it's a false confession and this is why***. But as far as particularized psychological individual characteristics, I believe that's prohibited in this state. . . .

14

However, ***the Court is not prohibiting the Defendant from putting forward testimony that, in fact, the confession was false***. He's free to say that through some other witness.

(Emphasis added).

¶25.    This Court stated in *Carnley v. State*, 348 So. 3d 1071, 1077-78 (¶29) (Miss. Ct. App. 2022):

> "Our well-established standard of review for reviewing the trial court's admissibility of evidence, including expert witness testimony, is abuse of discretion." *Jones v. State*, 918 So. 2d 1220, 1223 (¶9) (Miss. 2005). "Unless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice a party in a civil case, or the accused in a criminal case, we will affirm the trial court's ruling." *Id*.

¶26.    Wilson argues on appeal that the circuit court erred in excluding Dr. Webb's testimony concerning false confessions in general. In his brief on appeal, Wilson contends:

> There are two issues regarding the testimony of Dr. Webb. The first is whether he should have been allowed to testify to the subject of false confessions. The second is whether he should have been allowed to testify regarding whether Timothy Wilson gave a false confession. At a hearing on Dr. Webb's testimony, The court specifically denied the first issue. With regard to the second issue, it stated "[t]hat doesn't preclude Dr. Webb necessarily from testifying about whether or not it was a truthful confession."

We find, however, that Wilson is procedurally barred from raising this issue on appeal based upon his assertion before the trial court that Dr. Webb would not be offered to testify about false confessions.

¶27.    The procedural bar notwithstanding, this issue is without merit. In *Edmonds v. State*, 955 So. 2d 787, 791 (¶¶5-6) (Miss. 2007), the supreme court addressed a similar issue:

> Rule 702 of the Mississippi Rules of Evidence is the standard for the

15

admission of expert testimony in Mississippi. When determining admissibility of expert testimony, courts must consider whether the expert opinion is based on scientific knowledge (reliability) and whether the expert opinion will assist the trier of fact to understand or determine a fact in issue (relevance). *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 38 (Miss. 2003). We also consider factors mentioned in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993): (1) whether the theory can be, and has been, tested; (2) whether the theory has been published or subjected to peer review; (3) any known rate of error; and (4) the general acceptance that the theory has garnered in the relevant expert community. *Id.*, at 593-94, 113 S. Ct. 2786.

We find that the circuit court did not err in excluding the testimony of Allison D. Redlich, Ph.D., concerning involuntariness of confessions because, during the extensive *Daubert* hearing held by the circuit court, Dr. Redlich herself admitted that her theories could not be empirically tested.

Wilson, as the proponent of Dr. Webb's expert testimony, had the burden to show that Dr. Webb's testimony in this regard was reliable and admissible. *See Scarborough v. Logan*, 395 So. 3d 381, 386 (¶12) (Miss. 2024); *Brown v. Prof'l Bldg. Sevs. Inc.*, 284 So. 3d 754, 762 (¶34) (Miss. Ct. App. 2017). Wilson offered no proof under *Daubert* or Rule 702 to show that Dr. Webb's testimony concerning false confessions was admissible considering the four *Daubert* factors set forth above. This issue is procedurally barred and without merit.

## V. Did the trial court err by incorrectly instructing the jury on the law?

¶28. Other than the wording of the issue, the only argument by Wilson under this assignment of error is the following:

The Court limited the defense to six instructions. While Rule 22 of the Mississippi Rules of Criminal Procedure provides that each party may present six pre-filed instructions, it also states [t]he court, for good cause shown, may allow more than six (6) instructions to be presented." In this case, such good

16

cause exists in that it is impossible to accurately instruct the jury as to the law in a case of this nature and length in a mere six instructions.

The remainder of Wilson's brief on this issue is comprised of a reprint of the fifteen proposed jury instructions Wilson filed in the trial court. Wilson presents no argument as to how the instructions given to the jury were incorrect or insufficient. The only authority cited by Wilson in this issue is a California appellate court decision providing that the standard of review as to whether the jury instructions accurately state the law is de novo. *This is not the proper standard in Mississippi.* Mississippi appellate courts review a trial court's refusal of jury instructions under an abuse-of-discretion standard. *Baker v. State*, 315 So. 3d 558, 563 (¶13) (Miss. Ct. App. 2021) (citing *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010)).

¶29. In any event, because Wilson has failed to make any meaningful argument as to how the jury was "incorrectly" instructed and because he has failed to support any argument with relevant authority, we find this issue is procedurally barred. *See Conner*, 392 So. 3d at 456 (¶20); M.R.A.P. 28(a)(7).

> **VI.** **Was the evidence insufficient to sustain Wilson's conviction for felony child abuse and did the trial court err by failing to grant a directed verdict?**

¶30. Wilson argues that the evidence presented by the State at trial was not sufficient to support his conviction and further that the trial court erred in denying his motion for a directed verdict. While Wilson argued these issues separately in his brief, we will discuss them together. Wilson claims that the State presented insufficient evidence to prove that he acted intentionally, knowingly, or recklessly, as required for a conviction of felony child

17

abuse pursuant to Mississippi Code Annotated section 97-5-39(2)(c). Wilson claims that the circumstantial evidence only showed he was present at the time that A.W. became unresponsive and that this was not enough to prove he intentionally caused A.W. harm. Wilson also argues that "ample" testimony showed that A.W. did not suffer serious bodily harm to satisfy that element of the crime. For these reasons, Wilson claims that his motion for a directed verdict should have been granted and that his conviction should be reversed.

¶31.    Concerning our standard of review of the sufficiency of the evidence, this Court stated in *Jones v. State*, 380 So. 3d 974, 980 (¶13) (Miss. Ct. App. 2024):

> We review a challenge to "the legal sufficiency of the evidence" de novo, but the evidence must be "viewed in a light most favorable to the State." *Johnson v. State*, 904 So. 2d 162, 166 (¶7) (Miss. 2005). This means that "all credible evidence supporting a defendant's guilt should be accepted as true, and all favorable inferences drawn from the evidence must be reconciled in the prosecution's favor." *Id*. "We determine if any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Williams v. State*, 285 So. 3d 156, 159 (¶11) (Miss. 2019). "We are not required to decide — and in fact we must refrain from deciding — whether we think the State proved the elements." *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010). Rather, we must affirm the conviction as long as there is sufficient evidence for a rational juror to find that the State proved all the elements of the offense. *Id*.

Further, in *McNair v. State*, 346 So. 3d 512, 516-17 (¶18) (Miss. Ct. App. 2022), this Court stated:

> "A criminal defendant has several procedural vehicles available to him for challenging the sufficiency of the evidence." *Russell v. State*, 296 So. 3d 217, 223 (¶16) (Miss. Ct. App. 2020) (quoting *Myles v. State*, 774 So. 2d 486, 490 (¶15) (Miss. Ct. App. 2000)). "A challenge to the sufficiency of the evidence 'can be raised in a motion for directed verdict made at the end of the case for the prosecution, a request for a peremptory instruction at the end of all of the

18

evidence or the motion for a directed verdict at that point, or finally, a motion for judgment of acquittal notwithstanding the verdict.'" *Id.* (quoting *Myles*, 774 So. 2d at 491 (¶15)). "When the sufficiency of the evidence is challenged on appeal, we review the circuit court's ruling on the last occasion when the sufficiency of the evidence was challenged before the trial court." *Id.* In this case, Roy filed an unsuccessful post-trial motion challenging the sufficiency and weight of the evidence.

¶32. In the case at hand, Wilson filed a "Motion for New Trial and/or Judgment Notwithstanding the Verdict" (JNOV). In his motion, Wilson claimed that the evidence was insufficient to support the jury's verdict; however, he did not state with any specificity how the evidence was insufficient. In *Black v. State*, 400 So. 3d 464, 471 (¶23) (Miss. Ct. App. 2024), this Court stated:

> "A motion for a directed verdict on the grounds that the State has failed to make out a prima facie case must state specifically wherein the State has failed to make out a prima facie case. Motions for a directed verdict must be specific and not general in nature." [*Griffin v. State*, 296 So. 3d 337,] 350 (¶40) [(Miss. Ct. App. 2018)] (quoting *Sheffield v. State*, 749 So. 2d 123, 126 (¶10) (Miss. 1999)). "Post-trial motions for a judgment notwithstanding the verdict (JNOV) or a new trial require the same specificity." *Id.*

Because Wilson's JNOV motion was not specific in nature, this argument is barred from review. However, notwithstanding the bar, Wilson's argument has no merit.

¶33. In the case at hand, Dr. Benton gave expert testimony as to A.W.'s injuries as well as his opinion as to how A.W. sustained those injuries. Dr. Benton confirmed that on the day of the incident, A.W. exhibited an altered mental status, hypothermia, respiratory failure, absence of external trauma, severe retinal hemorrhaging in both eyes, bleeding around both sides of her brain, in both the subdural and the subarachnoid spaces, and evidence of torn

19

cortical veins.  He further testified that he did not believe that seizures explained what occurred with A.W. in this particular instance.   At the close of Dr. Benton's direct examination, he testified as follows:

> Q.     Dr. Benton, given all that we've talked about here today, in your medical opinion -- to a reasonable degree of medical certainty, do you have an opinion as to whether or not [A.W.'s] injuries were the result of abusive head trauma?
>
> A.     Yes.
>
> Q.     And what is that opinion?
>
> A.     With reasonable medical certainty, the constellation of findings that are seen in this case, the absence of a history of explanatory  accidental trauma, this is non-accidental trauma, or abusive head trauma.
>
> Q.     Sometimes people refer to that as shaken baby syndrome. Is that correct?
>
> A.     Correct.

Not only did an expert testify to the nature of A.W.'s injuries and the cause of her injuries, Wilson confessed to Investigator Burnell that he was responsible for A.W.'s injuries.  Burnell testified as follows:

> Q.     At some point did Mr. Wilson indicate to you that he wanted to tell you something else?
>
> A.     Yes, sir.  So after he heard the ladder speech, he kind of dropped his head a little bit and said -- said he lied to me.  And so at that point in time, Lieutenant Zetterhome directed us back out.  So I was -- I was motioning for him to do the same.  So me and Mr. Wilson left Lieutenant Zetterhome's office, went back to the interview room where we originally were to try and delve more into the lying portion of what he had said. While we were en route back to the interview room, he was

20

apologetic and stated that he was sorry for lying to him -- lying to me. I told him that, you know, Don't worry about it. It happens. We went back in and, essentially, started -- learned of a second account of events from Mr. Wilson.

Q. Okay. And go ahead and tell the ladies and gentlemen that second account of events.

A. So essentially everything that Mr. Wilson told us during the initial account was factual. We went back through all of it and there was simply an omission made from his account of events. So according to Mr. Wilson, he was in the living room area watching the TV program, and he had been up several times with the child, and she had started crying again. And walked back into the room and grabbed her by the shoulders and shook her for what he estimated to be 15 seconds. He gave this account in front of Detective Reid, and then Detective Reid did step out for a moment. And just to make sure that we were -- that Sergeant O'Flaherty knew what was going on whenever he stepped in, I had Mr. Wilson go back through the entirety of the story again and then even had him demonstrate on me like what he did to the child, how he shook the child, how he held the child and shook her and confirmed again that it was approximately 15 seconds.

The video of Wilson's confession was played for the jury and entered into evidence as Exhibit S-7. Given the expert testimony by Dr. Benton and Wilson's confession to detective Burnell, we find no merit to Wilson's claim that the evidence was insufficient to support his conviction and the trial court did not err by denying his motion for a directed verdict.

**VII. Should Wilson's conviction and sentence be reversed as a result of cumulative error?**

¶34. This Court has found no error by the trial court, harmless or otherwise. Therefore, Wilson's argument regarding cumulative error has no merit. *See Thomas v. State*, 416 So. 3d 102, 117 (¶53) (Miss. Ct. App. 2025).

21

## CONCLUSION

¶35.   Wilson's conviction and sentence for felonious child abuse are affirmed.

¶36.   **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., LAWRENCE, McCARTY, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**